EXHIBIT H

NY_DOCS:615453.1 [99998.42025]



From: **Peter Mikkelsen** peter@blocktech.com
Subject: NDAs & contracts for Lilit and Kristine
Date: April 15, 2019 at 2:04 PM America/Los_Angeles
To: Nick Spanos nick@blocktech.com, Eric Dixon eric@blocktech.com

Dear Nick and Eric
Please find the contracts and NDAs for our two new technical interns attached.

All the best
--
**Peter G. Mikkelsen**
Director of Business Development & Partner
Blockchain Technologies Corp.

EU +45 41 41 04 05
US +1 707 800 4752
AM + 374 44 41 0403
peter@blocktech.com
**Preferred:**
Whats app: +45 41 41 04 05
Telegram: +45 41 41 04 05

Notice - This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by replying to this e-mail and delete the message and any attachment(s) from your system.

 Virus-free. www.avg.com

**Attachments:**
ZAP_SIGNED.pdf (2.52 MB)
BLOCKTECH_SIGNED.pdf (4.31 MB)
ZAP_SIGNED(2).pdf (2.69 MB)
BLOCKTECH_SIGNED(2).pdf (4.25 MB)

Yerevan March 1st, 2019 «Synapse Foundation" Baarerstrasse 14-16, 2nd floor 6300, Zug Switzerland /hereafter Client/, representative director Nick Spanos, who is acting according the Statute of the Company, in one hand, and Citizen of RA Lilit Otaryan /hereafter Provider/ /ID: AR0405616, issued in 03.01.2019 by 0061, address: Yerevan, Arshakunyats 54/3, ap. 11, in other hand /together named Parties/, formed this service agreement /hereafter Agreement/ according to the Civil Law of RA.

## 1. GENERAL CONDITIONS

1.1. This agreement regulates work relationships between the Parties, states rights and obligations of the Parties and their responsibilities.
1.2. With this Agreement Provider obliged to do work designed in this Agreement with respect of terms and conditions decided by Client and Client is obliged to pay Provider for this work.

## 2. SUBJECT of AGREEMENT

2.1. Client hires Provider for the services of a Technical intern
2.2. The main tasks for the Provider are:
- Work with the technical team and perform any technical tasks demanded.
- To learn and master the programming languages used in the company to produce smart contract oracles.
- To present excellent work ethic and help show up for work prepared.
- To do any command, order or decision related to the function of the provider from the appointed manager of the Director, in this case Peter Gelardi Mikkelsen, Director of business Development and directly subordinate to the orders of the manager.

2.3. The place of the work is the one sited by the Client.

## 3. RIGHTS and OBLIGATIONS of the PARTIES

3.1. The Client had a right to:
3.1.1. to request from the Provider to do her work obligations on time and in right manner.
3.1.2. to define main conditions of Provider's work, deadlines, order and give tasks to be done.
3.1.3. Request from the Provider to do tasks not designed by current Agreement according the Legislation of RA and other Laws.
3.1.4. In the case of change of production volumes and (or) economic and (or) technological and (or) labor conditions, to modify the essential conditions of work.
3.1.5. In the manner prescribed by law, to subject the Provider to material responsibility, if she caused Material Damage to the Client.
3.1.6. To carry out any other right designed by the Civil Law, the Client's internal regulations and current Agreement.

3.2. Client obliged to:
3.2.1. Provide the Provider with the tasks provided by the Agreement and to organize its work, ensure safe and healthy working conditions.
3.2.2. Pay the Provider's salary within the time and under the terms stipulated by the current Agreement.

3.3. Provider has a right to:
3.3.1. receive a remuneration for the work performed within the timeframe and in the prescribed amount provided by the Agreement,
3.3.2. obtain information and explanations on the issues related to her activities, submit relevant documents and materials to the Client,
3.3.3. without prejudice to the terms and conditions provided by the Agreement, Client's internal regulations, other legal acts adopted by the Client, to work in other company,
3.3.4. submit proposals to the Client on the organization of his work,
3.3.5. get acquainted with the internal and individual legal acts of the Client which are directly related to her work.

3.4. Provider obliged to:
3.4.1. faithfully fulfill the obligations undertaken under the Agreement, as well as the Client's instructions arising from the Agreement and / or the Client's internal disciplinary rules and / or other internal and individual legal acts,
3.4.2. maintain the Client's internal disciplinary rules, work discipline and do not allow working regime violations, perform working norms, maintain labor protection and safety requirements, as well as Provider's ethics rules,

3.4.3. respect the property of the Client and other workers, as well as immediately inform the Client about possible a dangers of the Client's property protection, the life and health of the workers,

3.4.4. ensure the protection of any confidential information she is aware due to her work, otherwise she will face a penalty.

3.4.5. execute its duties personally and to instruct the other person in labor relations with the Client only with the permission of the Client,

3.4.6. in case of temporary disability, inform the Client on the same day personally or person affiliated with her,

3.4.7. execute the law, other legal acts, internal disciplinary rules and other obligations prescribed by the current Agreement.

## 4. DURATION OF AGREEMENT

4.1. The Agreement enters into force on March 1st 2019 and operates 6 months.

4.2. The Agreement can be terminated any time with 21 days notice if there is a no need for services with forming final act on the services done.

## 5. SALARY CONDITIONS

5.1. The internship is unpaid

## 6. RESPONSIBILITY of the PARTIES

6.1. The Parties bear responsibility for non-fulfillment or improper fulfillment of their obligations under the general procedure defined by the Swiss legislation.

6.2. In case of inflicting material damage to the Client as a result of non-performance or improper performance of her job duties, the Provider shall be subject to disciplinary, material and other liability in the manner prescribed by the current legislation of the country of Switzerland. Material liability arises when the Provider fails or improperly performs her obligations.

6.3. Payment of penalty does not relieve the Parties from the fulfillment of their obligations under the Agreement.

## 7. DISPUTE RESOLUTION

7.1. In case of a dispute between the parties, it shall be subject to resolution through direct negotiations between the Client and the Provider.

7.2. If the dispute between the parties is not settled, it shall be subject to judicial review in the manner prescribed by the Swiss legislation.

## 8. FORCE-MAJOR

8.1. The Parties shall be exempt from liability if it was the result of an force-major that arose after the conclusion of the Agreement and which the Parties could not anticipate and / or prevent. In the event of a force majeure, the Party whose obligation will discharge the force majeure is obliged to inform the other Party immediately.

## 9. Nondisclosure of Confidential Information:

9.1 The term "Confidential Information" means all financial and other nonpublic information, notes, analyses, compilations, third party contacts, clients, investors, studies or other documents provided by the parties to one another during the Discussions, including any proprietary information concerning their respective businesses, operations, assets, trade secrets, techniques, models, data, code, research, processes, procedures, business strategy, marketing, pricing, financial data and other such information, whether or not reduced to writing or other tangible form and whether or not expressly designated "Confidential". All such information if disclosed during the Discussions shall be deemed confidential, unless the disclosing party expressly designates as "Not Confidential".

9.2 Confidential Information shall not include (i) information already and lawfully known prior to being obtained during the Discussions; (ii) information that can be demonstrated by clear and convincing evidence to have been in the public domain at the time of disclosure; and (iii) information approved for release by written authorization of an authorized officer of the Disclosing Party.

9.3 Should only a portion of any Confidential Information fall within the scope of Section 1.2, all other Confidential Information so disclosed shall remain within the scope of Section 1.1 and subject to the prohibitions set forth below.

9.4 Each party will use any Confidential Information it might receive during the Discussions solely to evaluate the prospective commercial relationship contemplated between them. Both parties shall hold all such Confidential Information in strict confidence, except to the extent permitted by Paragraph 1.6 below. Neither party shall reverse engineer, disassemble or decompile any prototypes, software, or other objects conveyed hereunder. Each party shall

use a standard of care and discretion to avoid releasing Confidential Information received during the Discussions not less than that which it accords it's own propriety and/or trade secret information.

9.5 Confidential Information may be disclosed internally by either party as may be necessary for the sole purpose of evaluating and negotiating the commercial relationship and/or transactions contemplated by the Discussions. Disclosure may also be permitted for that purpose to either party's accountants, attorneys, consultants, affiliates, directors and officers, on a need to know basis. All such persons shall be informed of the information's confidential nature, and required to maintain it in accordance with this agreement.

9.6 Should either party be legally required (i.e. by subpoena or other legal process) to disclose Confidential Information imparted to it, that party shall promptly notify the other party so that the disclosing party may: (i) seek a protective order or other appropriate remedy; or (ii) waive compliance with this Agreement as to the Confidential Information sought to be revealed. Absent a protective order, if the receiving party is still in the written opinion its counsel legally required to disclose Confidential Information, it shall; (i) again notify the other party; (ii) furnish only so much of the Confidential Information as is legally required; and (iii) use best efforts to obtain reliable assurance that the Confidential Information will be treated confidentially. Neither party must risk citation for contempt or other judicial penalty in any such situation if the disclosing party fails or is unable to timely intervene.

9.7 Except as permitted herein, for thirty six (36) months after conclusion of the Discussions, neither party shall disclose to any person that Confidential Information has been made available, that Discussion of negotiations are taking place or have taken place, and/or any of the terms, conditions or other facts with respect to a potential commercial relationship between them.

9.8 Confidential Information disclosed hereunder shall at all times remain the property of the disclosing party. Immediately upon request by either party, both parties shall return or destroy all documents or tangible forms of Confidential Information received hereunder. Any confidential Information transmitted orally shall a remain subject to all restrictions set forth herein. The parties shall not retain any copies, extracts or other reproductions of any Confidential Information, and shall destroy all notes, memoranda and other writings in their possession based on any Confidential Information received.

9.9 Neither party makes any representation or warranty as to the accuracy or completeness of any Confidential Information disclosed hereunder, including but not limited to freedom from any claim or patent, trademark, and/or copyright infringement resulting from the use of such information.

## 10. Non-Circumvention

10.1 Commencing with the date of this Agreement and continuing for four (4) years following conclusion of the Discussions (the "Non-circumvention Period"), neither party shall solicit any kind of business from any existing supplier, client, contact, investor or strategic partner of the other party, with whom that party enjoys a business relationship, in order to (i) circumvent the relationship between that party and its supplier, customer, investor, client and/or contact, (ii) cause the revocation or termination of that relationship; or (iii) otherwise compete with one another; without prior written authorization.

## 11. FINAL PROVISIONS

a. When signing the Agreement, the Provider is familiar with working conditions, disciplinary rules of the Client.

b. Changes and additions to the current Agreement can be made solely by the Client in writing form. These amendments and supplements shall be enclosed to the current Agreement and shall constitute its integral part. In case of disagreement between the Parties them, the Worker may terminate her Agreement.

c. The issues not stipulated by the current Agreement are being regulated by the procedure established by the Swiss legislation.

d. The Agreement express consent of the Parties and has precedence over all previous oral and written agreements and contracts.

e. None of the Parties may disclose the terms and conditions of the Agreement without the prior consent of the other party, except in cases prescribed by law.

f. The Agreement may be resolved in the cases and in the manner prescribed by the Swiss civil law

## 13. REQUISITES AND SIGNATURES OF THE PARTIES

**CLIENT**
«Synapse Foundation"
Director Nick Spanos

_____

Signature

**PROVIDER**
Lilit Otaryan
ID: AR0405616,
Issued in 03_01_2019
by 0061, address: Yerevan, Arshakunyats 54/3, ap. 11

_____

Signature

## The NON-DISCLOSURE, CONFIDENTIALITY and INFORMATION PROTECTION AGREEMENT

This Nondisclosure, Confidentiality and Information Protection Agreement ("Agreement") is made as of and effective this _21_ day of _March_, _2019_ by and between, on the one hand: **Blocktech, LLC,** a limited liability company formed under the laws of the State of Colorado, United States of America, and its subsidiaries, affiliates and assigns (each, as well as collectively for sake of simplicity, a "Disclosing Entity"), on the one hand, and:

(ii) the Revenue Committee of the Republic of Armenia including any of its constituent taxation, revenue, regulatory and/or enforcement agencies, instrumentalities, offices or officers, Republic of Armenia (collectively, "Recipient"), on the other hand.

WHEREAS, the Recipient and the Disclosing Entity jointly contemplate that Recipient shall be engaged and licensed by the Disclosing Entity to implement, utilize, exploit, develop, conceive, market, promote or otherwise commercialize various concepts, data or intellectual property which is owned, controlled or licensed by Disclosing Entity and which constitutes the Confidential Information, as defined below; and

WHEREAS, the parties hereto may enter into a separate working agreement providing for Recipient to be either an agent, consultant or employee of or to the Disclosing Entity, but as to which no such offer has been made and is presently only contemplated, and in any event, such separate working agreement shall be a separate legally enforceable document;

NOW, THEREFORE, for consideration the receipt of which is hereby acknowledged, the parties hereto, hereby agree as follows:

1. Confidential Information.

A. The Disclosing Entity proposes to disclose certain of its confidential and proprietary information (the "Confidential Information," as defined below) to Recipient in the course of the commercial working relationship between the Recipient and the Disclosing Entity.

B. "Confidential Information" shall include all: data, materials, products, technology, computer programs, machines, manufacturing or assembling systems, compositions of matter of any type, designs, schematic renderings, techniques, specifications, patents, trademarks, service marks, trade names, trade secrets, mask works, ideas, concepts, any applications, work papers or white papers received, granted, awarded, licensed or made in connection with or preparation for any application for patents, trademarks, tradenames or service names or trade secrets or in contemplation of litigation regarding same, manuals, business plans and strategies, software, computer codes, source codes, object codes, computer protocols, software protocols, processes, formulae, calculations, algorithms, mathematical equations or concepts, cryptographic systems, systems, findings, conclusions, theories, improvements, discoveries,

Recipient Signature _____

1

analyses, developments, methods, marketing plans and strategies, financial information, licenses, pricing and customer information, cost information, margin information, business operations, business policies, strategies, information pertaining to competitors of the Disclosing Entity or potential business partners or employees of the Disclosing Entity, information regarding any personnel, consultants or employees of the Disclosing Entity including their skills, experience, prior employment and compensation, and other information disclosed, submitted, made accessible or available to or otherwise shared with whether in final, revised or draft form, and whether verbally or orally, in writing or printed form or by any other media, to Recipient (or any agent, affiliate or associate of Recipient) by the Disclosing Entity. Confidential Information shall also include any of the foregoing which may pertain to prospective or unannounced products, systems, methods or other knowhow, plans for or subject to such plans for research or development, regulatory approval or applications or petitions for such approval.

C. Any of the following: an invention, whether patented or unpatented or subject to a pending patent application, trade secret, concept or other subject matter which, if confidential under this Agreement would be included in the definition of "Confidential Information," which Recipient has made, created or conceived prior to the commencement of Recipient's services to or relationship with the Disclosing Entity (any of the foregoing, "Prospective Personal IP" or "PPIP"), and which Recipient wishes to exclude from the scope of this Agreement, must be disclosed in an attachment hereto prior to execution. Such attachment must list any PPIP which Recipient claims to have or caused to have conceived of, developed or reduced to practice, prior to the commencement of any services to the Disclosing Entity, and which Recipient claims to be either Recipient's property or the property of third parties and further wishes to have excluded from the scope of this Agreement. If Recipient does not attach an attachment with any such wished or desired exclusions, Recipient will thereby represent and warrant to the Disclosing Entity that Recipient has and claims no such PPIP.

D. If during the course of Recipient's services with or for the Disclosing Entity, Recipient incorporates (whether intentionally, accidentally or tangentially) PPIP into any product, system, method, process, machine or other subject matter of a nature or category enumerated in this section, which if confidential would constitute Confidential Information, Recipient shall grant to the Disclosing Entity a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license including rights to sublicense, to make, modify, have made, use, develop, commercialize and sell such PPIP. Furthermore, Recipient agrees that Recipient will not incorporate, or permit to be or have incorporated, any PPIP into any Disclosing Entity product, system, method, data, item, process, machine or invention, without the Disclosing Entity's prior written consent.

E. Confidential Information disclosed orally shall be identified as such within five (5) days of disclosure. Nothing herein shall require the Disclosing Entity to disclose any of its Confidential Information at any time to Recipient. No disclosure hereunder shall act as a waiver of the Disclosing Entity's rights and protections under this Agreement.

Recipient Signature _____

2

2. Recipient's Covenants, Representations, Duties and Obligations.

A. Recipient agrees that the Confidential Information is to be considered strictly confidential, highly confidential and proprietary to the Disclosing Entity. Recipient acknowledges that the unauthorized use, disclosure or exploitation of the confidential information could cause irreparable and substantial harm to the Disclosing Entity. The Confidential Information need not be labeled or printed as confidential for these confidentiality obligations to arise and be assumed. Recipient shall hold the same in strict confidence, shall not use the Confidential Information other than for the purposes of its or his business with the Disclosing Entity or within the confines of a principal-agent, independent contractor or employer-employee relationship, and shall disclose it only to such other parties who have a specific need to know and upon prior written notice to and prior written approval of the Disclosing Entity. Recipient will not disclose, publish, broadcast, expose, disseminate, reveal or otherwise leave vulnerable or susceptible to misappropriation, any of the Confidential Information received from the Disclosing Entity to any other party whatsoever except with the specific prior written authorization of the Disclosing Entity.

B. Recipient represents and warrants to the Disclosing Entity that he is receiving the Confidential Information on his / its own behalf and not as an agent for or on behalf of any third party private or quasi private entity or corporation or government agency or entity (except in this case, the agencies, entities or other affiliates of Recipient). Recipient further represents and warrants that he/she is capable and authorized to execute, deliver and perform the obligations set forth under this Agreement, and is not subject to any restriction, injunction, contractual obligation or other encumbrance preventing, limiting or imposing conditions upon his or its execution, delivery and performance hereof.

C. Confidential Information shared, accessed or furnished in written, tangible or any other medium or form shall not be duplicated by Recipient except for the purposes of this Agreement. Upon the request of the Disclosing Entity, Recipient shall return all Confidential Information received in written or tangible form, including copies, or reproductions or other media containing such Confidential Information, within ten (10) days of such request. At Recipient's option, any documents or other media developed by the Recipient containing Confidential Information may be destroyed by Recipient. Recipient shall provide a written certificate to the Disclosing Entity identifying the Confidential Information destroyed, the time, date, place and manner of destruction and the description of the post-destruction products (e.g., proprietary report in printed form of paper binder, shredded fully at the date, time and place described herein) within ten (10) days thereafter.

D. Confidential Information shall be disclosed to Recipient in the course of the commercial or working relationship between the Recipient and the Disclosing Entity, or a contemplated relationship, as to which the terms of any such relationship shall be set forth in a separate agreement, and Recipient represents that he / she / it is receiving access to the Confidential Information only pursuant to or in furtherance of or in contemplation of such relationship.

Recipient Signature _____

3

E. Furthermore, the matters worked on by Recipient for or on behalf of the Disclosing Entity and any items produced, created, conceived or developed during such work, including data, materials, products, technology, computer programs, machines, manufacturing or assembling systems, compositions of matter of any type, designs, schematic renderings, techniques, specifications, patents, trademarks, service marks, trade names, trade secrets, mask works, ideas, concepts, any applications, work papers or white papers received, granted, awarded, licensed or made in connection with or preparation for any application for patents, trademarks, tradenames or service names or trade secrets or in contemplation of litigation regarding same, manuals, business plans and strategies, software, computer codes, source codes, object codes, computer protocols, software protocols, processes, formulae, calculations, algorithms, mathematical equations or concepts, cryptographic systems, systems, findings, conclusions, theories, improvements, discoveries, analyses, developments, methods, creations, derivations, materials, byproducts, concepts, products, or service manuals or practices, original works of authorship or creation or made by Recipient whether solely or with others in the course of Recipient's relationship with the Disclosing Entity, are "works made for hire" (as defined under the United States Copyright Act) and as such, are the exclusive property of the Disclosing Entity. Recipient disclaims, surrenders and releases any and all personal interest therein, and disclaims all ownership title, right or interest in any of the works made for hire, and conveys, transfers and assigns to the Disclosing Entity all of Recipient's worldwide rights, title and interest (including any intellectual property or trade secret rights) in said items. Recipient further covenants and agrees that Recipient shall execute, deliver and perform under any and all instruments, certifications or agreements and take such other acts as necessary, or desirable, to document, perfect, deliver and otherwise convey any assignment, transfer or conveyance contemplated hereunder, or to enable the Disclosing Entity to secure, assert, perfect, extend or maintain the full force and effect of any of its rights, including any intellectual property rights (patent, trademark, copyright) or trade secret rights in any matter which is included in the definition of Confidential Information.

3. Term. The obligations of Recipient herein shall be effective during the period of three years (the "Non-Disclosure Period") from the later of the date the Disclosing Entity last discloses any Confidential Information to Recipient pursuant to this Agreement, or the last day on which Recipient utilizes any Confidential Information of, uses any services of, or performs any services for or on behalf of the Disclosing Entity. Further, the obligation not to disclose shall not be affected by bankruptcy, receivership, assignment, attachment or seizure procedures, whether initiated by or against Recipient, nor by the rejection of any agreement between the Disclosing Entity and Recipient, by a trustee of Recipient in bankruptcy, or by the Recipient as a debtor-in-possession or the equivalent of any of the foregoing under local law.

4. Other Information; Relief; Exemptions. Recipient shall have no obligation under this Agreement with respect to Confidential Information which is or becomes publicly available without breach of this Agreement by Recipient, is rightfully received by Recipient without obligations of confidentiality, or which Recipient can document that Recipient developed independently, without breach of this Agreement; provided, however, such Confidential

Recipient Signature _____

4

Information shall not be disclosed until thirty (30) days after written notice of intent to disclose is given to the Disclosing Entity along with the asserted grounds for disclosure or documentation verifying its independent development.

5. No License. Nothing contained herein shall be construed as granting or conferring any rights by license or otherwise in any Confidential Information. It is understood and agreed that neither party solicits any change in the organization, business practice, service or products of the other party, and that the disclosure of Confidential Information shall not be construed as evidencing any intent by a party to purchase any products or services of the other party nor as an encouragement to expend funds in development or research efforts. Recipient strictly agrees not to use any Confidential Information as a basis upon which to develop or have a third party develop a competing or similar product or service within the industries in which the Disclosing Entity operates or engages in commerce.

6. No Publicity. Recipient agrees not to disclose his, her or its participation in this undertaking, the existence of this Agreement or any of its terms and conditions, or the fact that discussions regarding any subject are being held with the Disclosing Entity on any matter, except as required by law or court order and in any event, with prior written notice to the Disclosing Entity unless impractical or impossible, in which event such notice shall be made as soon as possible.

7. Damages, Governing Law and Equitable Relief. This Agreement shall be governed and construed in accordance with the laws of the United States and the State of New York and Recipient consents to the exclusive jurisdiction of the state courts and U.S. federal courts located there for any dispute arising out of this Agreement. Recipient agrees that in the event of any breach or threatened breach by Recipient, the Disclosing Entity may obtain, in addition to any other legal remedies which may be available, such equitable relief as may be necessary to protect the Disclosing Entity against any such breach or threatened breach.

8. Final Agreement; No Assignment. This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties. Recipient may not assign this Agreement or any interest herein without the Disclosing Entity's express prior written consent.

9. Representation of Authority. Recipient covenants, agrees, acknowledges, represents and warrants that its authorized signatory is duly authorized to execute, deliver and perform all obligations and undertake all representations and warranties under this Agreement.

10. Severability. If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

Recipient Signature _____

5

11. **Notices.** Any notice required by this Agreement or given in connection with it, shall be in writing and shall be given to the appropriate party by personal delivery or by certified mail, postage prepaid (United States mail) or a nationally-recognized overnight delivery service. If to the Disclosing Entity, notice goes to Blocktech LLC, 157 Prince Street, New York NY 10019 UNITED STATES. If to Recipient, notice goes to the address stated in clause (ii) of the introductory preamble to this Agreement. Recipient agrees, acknowledges and promises to promptly (within five days) notify all parties hereto of any change in his, her or its mailing address(es) for purposes of notice under this Agreement, and further agrees and acknowledges that his/her/its failure to provide such timely written notice shall be a defense to the notice requirements of this Agreement.

12. **No Implied Waiver.** Either party's failure to insist in any one or more instances upon strict performance by the other party of any of the terms of this Agreement shall not be construed as a waiver of any continuing or subsequent failure to perform or delay in performance of any term hereof.

13. **Headings.** Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**Blocktech, LLC**

By: _____     Date: _____
Nikolaos Spanos, Managing Member

Recipient (signing here and at the foot of each prior page)

Print Name: _Lilit Otaryan_
Address: _Arshakunyats 5413 apt. 11_   Date: _21.03.2019_

Recipient Signature _[signature]_

6