

The Empire State Building
350 Fifth Avenue, Suite 7710
New York, NY 10118

*Attorneys at Law*

tel: 212-239-9669   fax: 212-239-9688
www.catafagofini.com

October 29, 2020

<u>**Via ECF**</u>

Hon. Sarah Netburn
Thurgood Marshall Courthouse
40 Foley Square, Courtroom 219
New York, New York 10007

Re:     *Blockchain Technologies Corporation v. RVH Inc., et al.*, 18-cv-9352 (AJN)(SN)
        <u>Response to Defendants' October 26, 2020 Letter Motion</u>

Dear Judge Netburn:

        We represent Plaintiff Blockchain Technologies Corporation ("Plaintiff") and Third-Party Defendants Nick Spanos and The Synapse Foundation d/b/a Zap.org ("the Foundation" or "Zap") (collectively, the "Blockchain Parties").  Pursuant to Your Honor's Individual Rule II(c), we write in response to Defendants' October 26, 2020 letter (Doc. 100) ("Defendants' Letter") requesting various forms of relief on the eve of the October 30, 2020 discovery cutoff in this action.

        During the month of October, the parties engaged in meaningful settlement discussions and came very close to resolving this action.  We know Your Honor is exceptionally skilled at resolving contentious disputes, and we believe that a settlement conference held by Your Honor would be in the best interests of all parties.  We reached out to Defendants' counsel about mediation or a settlement conference and noted that an-person or even a 2-3 hour court-supervised settlement conference likely would have bridged the gap.  He did not disagree.  We also asked whether he would consent to a mediation before Your Honor, but have not received a response.  While we are constrained to respond to the letter application below, we believe that the parties' expenditure of resources, and more importantly Your Honor's valuable time would best be conserved through what would likely be an effective settlement conference with the parties.

**The Letter Motion Does Not Follow the Rules Regarding Such Applications**

        At the outset, it should be noted that Defendants fail to follow Local Civil Rule 37.2 of the Local Rules for the Southern District of New York and Rule II.C. of Your Honor's Individual Rules of Practice, which requires any party wishing to raise a discovery dispute to first confer in good faith with the opposing party.  Here, there was no meet and confer, and Defendants' Letter

fails to provide any evidence to the contrary, as is required.[1]  In addition, while the letter seeks discovery sanctions and an extension of discovery, Defendants' counsel has ignored two emails to set up depositions and waited over a month from our September 18, 2020 production to make the instant application to the Court.

**Defendants' Request for Extraordinary Relief Regarding Plaintiff's Former Patents Should Be Denied**

In arguing for dismissal of the Blockchain Parties' pleadings, Defendants contend that, in light of the documents produced by the Blockchain Parties, they now have discovered that Plaintiff Blockchain Technologies Corporation had its patents "stolen." *See* Defs. Ltr. at 2-3.  Defendants' contention is without merit for several reasons.

First, Defendants' claim that they just discovered that Plaintiff Blockchain Technologies Corporation assigned its two patents to nonparty Blocktech LLC in August 3, 2018 is simply not credible.  This is because the patent assignment documents that Defendants' claim to have never seen before (attached to Defendants' Letter at Exhibit A (Doc. 100-1)) were, at all times since their filing with the United States Patent and Trademark Office (the "USPTO") on August 3, 2018, publicly available.  In fact, the documents attached as Defendants' Exhibit A are all stamped by the USPTO and are available to the public on the agency's website.  Therefore, Defendants' claim that they just now discovered these documents, or that the Blockchain Parties somehow kept these publicly available documents "hidden" from Defendants, is simply untrue.

Second, Defendants' extraordinary request that this Court take the patents owned by nonparty Blocktech LLC and immediately return them to Plaintiff Blockchain Technologies Corporation (*see* Defs. Ltr. at 3) should be not granted.  To begin, the requested relief is tantamount to an attachment and a mandatory injunction.  Defendants' Letter requests that the Court strip assets from a nonparty – Blocktech LLC – notwithstanding the fact that the allegations contained in Defendants' Letter are not part of any of the pleadings in this action (and despite the fact that this transfer was made on August 3, 2018, two months ***before*** this action was commenced on October 12, 2018 (Doc. 1)).  There was no agreement in place requiring that notice of the assignment be given to Defendants, nor was there anything to restrict the assignment, a claim which in any event would first need to be pleaded.  Moreover, even if Defendants were to attach a proposed pleading seeking this relief, they do not have standing to assert such a claim.  Indeed, only the prior owner of the patents, Plaintiff Blockchain Technologies Corporation, has standing to seek to void the transfer.  While Defendants purport to be 20% shareholders in Plaintiff Blockchain Technologies Corporation with a UCC-1 security interest, they themselves do not have

---

[1] Defendants' Letter also exceeds the Rule II.C. page limit, does not request a conference, and was filed as a general letter motion.  Additionally, the letter does not cite or quote any discovery request or response and does not mention our letter (Exhibit A hereto) timely served along with the 8,500 pages of responsive documents.  (Defendants notably have produced about 500 documents in this case.)  At the last conference, the Court instructed Defendants to advise the Court promptly as to any continuing issues.  The Court made clear that discovery would end on October 30, and Plaintiff followed up by phone and email for deposition dates (*see* Exhibit B hereto), to no avail.  As noted above, there was no meet and confer.  Instead, Defendants' Letter deals with the jurisdictional motion regarding Zap which is *sub judice* and other merits issues unrelated to the current pleadings in this action.

an ownership interest in the patents.  Thus, Defendants do not have standing to assert that the patents must be returned to Plaintiff Blockchain Technologies Corporation.

Third, Defendants challenge the $100,000 value of the assigned patents.  *See* Defs. Ltr. at 3, footnote 4.  While this challenge could only be relevant to a fraudulent conveyance claim (which has not been asserted in this action), Defendants ignore that the patent assignment documents value the blockchain technology as a whole ***at the time of the transfer***, which was August 3, 2018.  It is likely that the value of blockchain technology in late 2020 is far greater than it was in mid-2018.  In any event, Defendants' allegation that the $100,000 was not market value is wholly conclusory; such a claim is not supported by any documentary evidence.

While styled as a discovery dispute motion, Defendants' Letter remarkably demands extraordinary dispositive and mandatory injunctive relief asking for the ultimate relief (not actually sought in this action) of an attachment, *including against non-parties regarding claims not yet interposed*.  Such demand is simply not appropriately made through a discovery letter motion.  *See* Fed. R. Civ. P. 72(a); Fed. R. Civ. P. 64 & 65.  Further, if and when properly made, it is submitted that such application would fail under the movant's "heavy burden in attempting to establish its right to an attachment, because 'New York attachment statutes are construed strictly against those who seek to invoke the remedy.'"  *National Audubon Soc'y, Inc. v. Sonopia Corp.*, 2009 WL 636952, at *2 (S.D.N.Y. Mar. 6, 2009) (quoting *Buy This, Inc. v. MCI Worldcomm Communications Inc.*, 178 F. Supp. 2d 380, 383 (S.D.N.Y. 2001)).  Similarly, any properly brought motion for injunctive relief places the burden upon the claimant of proving, by affidavit or written evidence, the four elements required under New York law: "that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to plaintiff."  CPLR 6212(a).  As the United States Supreme Court has stressed, "[a] preliminary injunction is an extraordinary and drastic remedy" that "is never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quotation omitted).  As a general matter, preliminary injunctive relief will not be granted unless the movant demonstrates "irreparable harm, and either a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in [his] favor."  *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 478-79 (2d Cir. 1995) (quoting *Polymer Technology Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir. 1992)).  Moreover, where, as here, the relief sought by the movant would involve a mandatory injunction, as distinguished from prohibitory relief, the movant must show not merely a likelihood of success, but a high likelihood of success on his claims.  *See Beal v. Stern*, 184 F.3d 117, 122 (2d Cir. 1999).

### There Has Been No "Fraud on the Court"

In spewing accusations regarding prior representations allegedly made relating to Synapse/Zap, Defendants' Letter fails to articulate any of its allegations with specificity.  Defendants' Letter fails to show how the Blockchain Parties "lied" and the letter even references (again with no detail) a representation made by a nonparty to this lawsuit (Eric Dixon).  In fact, none of the almost two dozen exhibits attached to the letter appear inconsistent with the representations made by prior counsel regarding Zap: "Zap.org, an Isle of Man company with a business address in Switzerland, has no connection to, and has no presence in, New York.  It does not transact business in New York, does not have an office or any presence in New York, does not

own property in New York, does not target New York in its dealings and does not avail itself of any of New York's laws or protections." (Doc. 64 at 1); "Zap.org is an Isle of Man Corporation headquartered in Switzerland with no physical presence in New York. The Third-Party Complaint does not allege that zap.org does any business in New York nor could such an allegation accurately be made." (Doc. 60). (*See also* Exhibit E hereto, Third-Party Defendant Spanos' March 2, 2020 EBT transcript regarding Zap: Q: Did you play a role in the creation of zap.org? (11:16-17) A: I'd like to believe so. (11:18); Q: Who was around in the beginning other than you? (19:19-20) A: So they could have been around in the beginning and then they could have left in the beginning. (19:21-23); Q: Where does zap.org keep its paperwork? (31:5) A: It's pretty much a paperless world right now. (31:6-7)).

In addition, Defendants' Letter ignores a publicly available document from the Isle of Man government that reveals a government filing from August 2017 for the Synapse Foundation. This document establishes that the entity indeed exists and is legally recognized in the Isle of Man, exactly as Plaintiff has truthfully claimed.

The fact remains that there are no Zap transactions, no office, and Zap does not target New York, nor could it because the Synapse Foundation does not have the necessary license to conduct such activity. New York State regulation prohibits any "virtual currency business activity" in the state unless the party has a special license (the "Bitlicense") or is an exempt institution (such as a bank). The Synapse Foundation does not have a New York State Bitlicense. Indeed, according to the Department of Financial Service, there are only 26 such licensees. At most, there have been a handful of promotional or advertising events in New York at which Spanos appeared and mentioned Zap, or for which Zap (probably for nominal cost) was listed as a sponsor, which would not suffice to establish jurisdiction over the foundation in New York. Notably, even if an event is located in New York, New York residents are not the target audience. Cryptocurrency industry events tend to attract a younger, mobile audience made up of individuals who, in addition to being technologically savvy and interested in digital assets, come from out-of-state for the industry event in question or are only in New York for short-duration stays. In short, the audience typically is not comprised of New Yorkers.

It bears repeating that Zap, the Zap tokens and the other "business" opportunities alluded to in the Defendants' Letter are issues that Defendants have no legal standing to pursue. Defendants are only alleged creditors and 20% minority owners of Blockchain Technologies Corporation, the entity alleged to have lost out on the opportunities. Even setting aside the fact that the letter does not explain what these "lost" opportunities were, it is clear that Defendants do not have standing to assert these new claims. There was no obligation for Mr. Spanos to disclose every single business idea to the Defendants, who are hard-money lenders (paying only $110,000 of the $250,000 they pledged to pay, and doing so only after bouncing a check), who possess at most only a *contested* minority 20% interest in the supposedly injured entity (which notably is suing them herein) and a security agreement.

The Defendants' Letter complains that very little was produced regarding the Synapse Foundation/Zap, including no organizational documents. However, as stated in our letter (Exhibit A hereto), we used 55 agreed-to search terms (which encompassed every term relating to Synapse/Zap) and produced thousands of pages of responsive documents. (Defense counsel has admitted that he never discussed search terms with Plaintiff's prior counsel. *See* Exhibit C hereto.)

We did a thorough search of all emails and documents in our clients' possession in a short two-week window, during the COVID-19 pandemic. All of the documents were produced on September 18, 2020, mere days after Mr. Spanos' mother passed away, and the funeral services were held during the weekend of September 11 to 13. Despite these difficulties, we used a team of attorneys and expended a tremendous amount of time and resources to address every alleged discovery deficiency. Everything that was available through painstaking application of the search terms was produced.[2]

**Defendants' Unsubstantiated Allegations Regarding the Alleged 83rd Street "Storefront"**

Based on a photograph allegedly taken earlier this month, Defendants claim that the Blockchain Parties are "actively" operating a Bitcoin Center under the name of Zap at a storefront located at 83rd Street in Manhattan. *See* Defs. Ltr. at 1, Ex. W. The photograph is not authenticated by an affidavit, and Defendants do not specify the location other than "83rd Street." *See* Ex. W. In any event, this unsubstantiated allegation is false. The alleged storefront is not a functioning bitcoin center. To begin, the photographs show unoccupied, unfinished retail ground space. The image of the inside of the alleged "storefront" – which, again, Defendants do not identify by intersection or conventional street address – do not reveal any business activity. The contents of the indoor space are isolated pieces of furniture, one picnic table, and what appears to be one computer and a tube of disinfecting liquid. Contrary to Defendants' speculation that the photograph shows "assets of BTC" in the form of an ATM machine, there is no "ATM" machine in the photograph. The machine in the photograph appears to be a non-functioning computer, and is not the property of Plaintiff Blockchain Technologies Corporation.

Moreover, the mere fact that there is advertising for Zap in the window of the storefront is plainly insufficient to establish minimum contacts for personal jurisdiction purposes under New York law. The Synapse Foundation/Zap.org does conduct any business at the alleged storefront. Synapse Foundation/Zap.org has no leasehold interest (or any other type of interest in the commercial space), and does not otherwise conduct business in the 83rd Street storefront. The Defendants' speculation regarding the retail space is simply untrue.

**The Allegedly Missing Disclosure Schedule from the 2015 Documents of Global Arena**

It is important to address a critical red herring in Defendants' letter: namely, the allegedly missing Disclosure Schedule from the 2015 documents of Global Arena. As explained in our letter (Exhibit A), we produced the only copy in our possession. Simply because the document refers to a schedule does not mean it was there. It could have been a typographical error, or the document

---

[2] While not supportive of the relief demanded in the letter, many of the exhibits attached to the Defendants' Letter constitute privileged communications (e.g., Exhibit S references a business model sent to attorney Dixon for legal advice) and were inadvertently produced in the rush to produce the thousands of documents referenced in Exhibit A hereto. Under the law, the clawing back of these inadvertently produced privileged documents is appropriate and we are attempting to resolve this FRE 502(b) issue with counsel amicably without using more of the Court's valuable resources. We hope to avoid a further application which would need to be made quickly. *See BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 2013 WL 2322678, at *7 (S.D.N.Y. May 21, 2013) ("The period after the producing party realizes that privileged information has been disclosed is the relevant period for measuring whether the privilege has been waived." (citing *Aramony v. United Way of America*, 969 F. Supp. 226, 237 (S.D.N.Y. 1997))).

never existed.  Moreover, as explained below, Defendant Herskowitz was well aware of any additional "business opportunities" that he now claims were recently discovered.

Defendant Herskowitz, through counsel, acts as if he has no connection to the penny stock public company named Global Arena Holding Inc. ("Global Arena").  However, his attempt to conceal his connection to Global Arena from this Court is futile.  While Defendant Herskowitz claims that the Blockchain Parties have not produced exhibits to a merger agreement from May 2015 between Plaintiff Blockchain Technologies Corporation and Global Arena, the Blockchain Parties have provided all of the documents in their possession, custody and control.  What is not being disclosed to the Court is that Defendant Herskowitz has had extensive contacts and done extensive business with (including making multiple loans to) Global Arena both before the transactions with Plaintiff (going back to 2011) and well after.  For example, a December 2017 email from Defendant Herskowitz shows his appearin to act as an agent of Global Arena regarding a purported proposed investment of $500,000 by Global Arena for additional equity in BTC *including, very notably, an interest in the intellectual property of BTC.*  A true and correct copy the December 2017 email produced in this action is attached hereto as Exhibit D.

It is thus clear that Defendant Herskowitz acted as an agent of Global Arena, which was never an arms-length, uninvolved third party, unrelated to the bridge loan at issue in this action.[3] At the time of the February 2015 bridge loan, the patent applications were not contemplated to be transferred to Defendant, nor were they wholly owned by Plaintiff Spanos (in fact Mr. Spanos was only a 25% owner of the patents).  At the time of the February 2015 bridge loan, the patents were only in the provisional application phase and Plaintiff Blockchain Technologies Corporation was only assigned the patent interests in December 2016.  This timing explains why **at the time of the Herskowitz loan in February 2015**, the patents were not named specifically as collateral and were no security agreement or interests were recorded with the USPTO – because there was *no interest* in what was then only a *provisional* application.

But for the unfulfilled and breached covenant by Global Arena (with whom Herskowitz has had a long business relationship, see below), Plaintiff Blockchain Technologies does not accept the assignment of the patents Herskowitz clearly covets, nor does Plaintiff default on its obligations to Defendant Herskowitz (notwithstanding Herskowitz's own non-performance). In fact, but for the false inducements by Mr. Herskowitz and Global Arena, Plaintiffs would not have entered any agreement with them, not to merge with Global Arena and not to take a so-called short-term bridge loan from Mr. Herskowitz.

---

[3] Global Arena is controlled by a man named John Matthews, who has a checkered record with the SEC and who was first trained at Stratton Oakmont, Inc., a Long Island, New York "over-the-counter" brokerage house founded in 1989 by Jordan Belfort whose past misdeeds were the subject of the *Wolf of Wall Street* movie.  That company defrauded many shareholders leading to the arrest and incarceration of several executives, and the closing of the firm in 1996. Mr. Spanos was introduced to Mr. Matthews and Mr. Herskowitz by Kent Pfeffer, who described himself as an advisor for Apollo Capital Corp.  It was learned much later that Mr. Pfeffer (then going by the name Lyle) had been indicted for fraud conspiracies involving Heritage Life Insurance Co. and the mob-controlled strip club *Scores* before becoming a government informant in the *Scores* case.  *See USA v. Pfeffer*, 97-cr-00971 (S.D.N.Y.).  Originally sentenced to 25 years for his crimes, Mr. Pfeffer's sentence was reduced as he cooperated against his mobster partners in *Scores*.  This was the individual who worked to bring Mr. Herskowitz to Mr. Spanos for what was represented to be a short-term bridge loan.

Moreover, there is a consistent pattern of non-performance and breaches - by Mr. Herskowitz and Global Arena. It is undisputed Mr, Herskowitz did not fund even half the bridge loan ($110,000 was loaned, but the promise was $250,000). Global Arena did not fulfill its merger agreement, paying only approximately $125,000 in cash plus now-worthless stock to Plaintiff Spanos, when the contemplated deal that induced Spanos into the merger agreement and the bridge loan was $1.25 million plus stock in Global.

Additionally, before the patents were assigned from Blockchain Apparatus to Blockchain Technologies (*see* Defs. Ltr., Ex. D), supposed third party Global Arena agreed to satisfy the Defendants' security interest and note obligation of Plaintiff. This means the assignment to Plaintiff was intended to occur only well after Plaintiff and Spanos believed third party Global Arena satisfied its contractual obligation. Global Arena agreed in September 2015 as follows: "The Purchaser [Global] shall purchase the Herskowitz Security Interest and shall payoff (sic) the existing note held by Robert Herskowitz and RVH, Inc. which currently has an outstanding balance of principal and interest of approximately $110,000." *See* Common Stock Purchase Agreement between Global Arena Holding Inc. and Nikolaos Spanos dated as of September 30, 2015, filed as Exhibit 10.1 to Global Arena Holding Inc. 10/22/15 Form 8-K Special Report on Form 8-K filed October 22, 2015. The publicly available contract is accessible via the link below.[4]

This means that the patents at issue were assigned to Plaintiff ***only after*** Global Arena affirmatively agreed, in an agreement filed with the Securities and Exchange Commission and publicly available to investors, to assume Plaintiff's duties to Defendants. The Global Arena covenant in its Common Stock Purchase Agreement excuses Plaintiff's alleged default and operated to induce a continued default, from which Defendant Herskowitz (whose connections to Global Arena warrant careful examination) now attempts to profit.

The substantial connections between Defendant Herskowitz and third party Global Arena indicate that Defendants do not have "clean hands" and are trying to profit unjustly through their own actions and from damages they themselves induced, created and continued. It is their own actions which, ***first***, fraudulently induced Plaintiff's entry into the original February 2015 loan through the false promise of a "bridge loan" leading to a "reverse merger" into the publicly-traded Global Arena (which never happened). ***Second,*** Defendants' own actions induced a continued default through the false representation in the September 2015 Common Stock Purchase Agreement. Plaintiff was entitled to rely upon these contractual covenants and representations, and was harmed by their falsity and nonperformance.

**Connections Between Global Arena and Defendant Herskowitz**

*First,* the Promissory Note dated February 24, 2015, whose Section 1.02.A (page 2) provides that the Closing will "take place at the **offices of Global Arena**"; and Sections 1.02.D.(i) and 1.03 (maturity date) both refer to a company raise or "gross proceeds of Three Hundred Sixty Thousand ($360,000)" which, when read in conjunction with the Purchase of Shares and Shareholder Agreement ("Shareholder Agreement," Sections 4 and 8, *see* below), is clearly a reference to an investment by Global Arena into Plaintiff Blockchain Technologies Corporation.

---

[4]https://www.sec.gov/Archives/edgar/data/1138724/000101489715000322/exhibit10.htm

*Second,* Section 8(ii) of the Shareholder Agreement (*see* page 8), dated February 24, 2015 (included as one of Defendants' exhibits), contemplates that "the Corporation [BTC] shall make a reverse merger with Global Arena Holding, Inc., RH will sell the RH Shares in terms and conditions **agreed between RH and Global**, provided at that time the note shall be fully paid and the restrictions set forth in Section 4A [on share transfer] and (sic) are thereby released and no longer be in effect."  (Emphasis added).

*Third,* the Shareholder Agreement Section 8(iii) provides that "the Corporation May without RH approval raise Three Hundred Fifty Thousand ($360,000) Dollars in debt or equity...provided that the Corporation [BTC] forthwith utilizes such amount to pay off the Note and accrued interest to RVH Inc in full."  (sic).

*Fourth,* several messages from January 12 and January 15, 2015 in which Defendant Herskowitz funding a $250,000 bridge loan was referenced in an email sent January 12, 2015 (about six weeks before the RVH loan documents were signed) by Mr. Pfeffer to Global Arena CEO John Matthews, to which Defendant Herskowitz is copied, about Mr. Matthews' request for a use of proceeds breakdown for a "$250,000 bridge loan."  Defendant Herskowitz, through RVH, would become the source for that bridge loan.  See also, in the same email chain, Mr. Pfeffer's January 12, 2015 email stating: "Robbie said he would get us the paperwork for the proposed bridge."  "Robbie" is Defendant Herskowitz.  Later in the email chain, on January 12, 2015, Global Arena CEO Mr. Matthews writes "we are on track with Term Sheet for Wednesday."  The email chain ends (the latest email by chronology) with a message from Kathryn Weisbeck (an employee of Global Arena) on January 15, 2015, stating: "Please find the attached term sheet signed by Mr Matthews." (sic).  *See* Exhibit D.

*Fifth,* Herskowitz's email dated February 18, 2015 to Mr. Pfeffer, copied to Plaintiff Spanos and Global Arena CEO Mr. Matthews, stating: "As per our conversation yesterday, the bridge loan docs are pretty much done and **RVH Inc.** is prepared to close ASAP subject to the ok of **John from Global**." (emphasis added).

*Sixth,* the BTC-Global merger was referenced in a Spanos email dated **May 12, 2015** to Defendant Herskowitz, when Plaintiff Spanos wrote "I'm forwarding to you a basic overview of where we have spent the approximately $85,000 that you have advanced so far.  Blockchain requires an additional advance of $75,000 to help complete all of the necessary issues for the Global Arena deal."

*Seventh,* an email from Defendant Herskowitz dated **May 13, 2016** to Kent Pfeffer, Nick Spanos and Global Arena CEO John Matthews suggesting a meeting that day.

*Eighth,* a Spanos email to Defendant Herskowitz and Mr. Matthews dated **May 29, 2015** requesting $75,000 and stating: "These funds are necessary to help us complete our merger into GAHC."

*Ninth,* on December 11, 2017, Defendant Herskowitz sends Plaintiff Spanos an email stating "this is basically everything you wanted," and the email consists of a term sheet for the purchase, by **Global Arena**, of five percent of the equity of BTC for the price of $500,000.  (This implies a value of Blockchain Technologies of $10,000,000 in December 2017.)  The footer in the

email is that of John Matthews, the CEO of Global Arena, yet this is in an email sent by Defendant Herskowitz.  This is in stark and puzzling contrast to Global Arena's disclosure, to the investing public and the Securities and Exchange Commission in September 2020, that it decided to write down to zero the value of its 2015 purchase of ten percent of the common stock of Plaintiff.  The term sheet also specifically mentions the purchase of intellectual property, revealing perhaps for the first time the interest of Defendant Herskowitz and Global Arena in that specific asset.

*Tenth,* Mr. Matthews' February 19, 2018 email to Defendant Herskowitz referencing a draft Blockchain deal (produced by Defendant Herskowitz); this email is dated two months after the Herskowitz email containing the Global Arena term sheet expressing interest in purchasing 5% of Plaintiff's equity and its intellectual property.

*Eleventh,* another document in Defendant Herskowitz's production refers to a draft settlement agreement "effective February 2018" which has a Section 1.03 that appears very similar to the Section 1.06 in the Global-Spanos Securities Purchase Agreement dated September 30, 2015.  **The draft settlement agreement Section 1.03 has Global paying Plaintiff, and in turn, Plaintiff using those proceeds to retire the debt at issue to Defendants.**

*Twelfth through Sixteenth,* no fewer than **five different promissory notes to Defendant Herskowitz, as lender,** from Global Arena (formerly known as China Stationery) to RVH (all produced by Defendants):

(a) Global 2012 note to RVH (By the way, this looks very similar to note from BTC in March 2015 deal;
(b) Global 2011 note to RVH;
(c) China Stationery (previous name of Global Arena) March 2011 note to RVH;
(d) China Stationery August 2011 note to RVH; and
(e) China Stationery note June 2011 to RVH.

These five promissory notes demonstrate Defendant Herskowitz's long history with Global Arena.  In fact, the similarities between those notes and the documents with Plaintiff appear to suggest Herskowitz routinely engages in these types of predatory transactions.

**Defendant Herskowitz's Awareness of That Over Which He Now Professes Ignorance**

Defendant Herskowitz also knew about the World Bitcoin bankruptcy in at least June 2015.  On June 1, 2015, Defendant Herskowitz was sent an email directly from World Bitcoin's lawyer, Joel Shafferman, which attached the pleadings.  Defendant Herskowitz was also provided with Bitcoin Center draft materials as early as September 2014.  Notably, Defendant Herskowitz's loan makes no mention of the Bitcoin Center; and Defendant Herskowitz knew about all of the center's portfolio companies and projects, and was lending to one discreet entity – Plaintiff Blockchain Technologies Corporation.  While he had his choice of entities to lend to, it is significant that this hard money lender, working in tandem with Global Arena on what turned out to be a bait and switch scheme, never loaned anything to Blockchain Aparatus, the first entity to which the patents were assigned when they were still at the provisional stage.

While Defendants' letter claims there are some missing financial records, the Blockchain Parties have produced everything that was requested and was available in its custody and control.

Defendant Herskowitz was also provided Plaintiff's bank statements as early as June 1, 2015 with attached statements dated February 2, 2015, March 3, 2015 and April 4, 2015.  In sum, the Blockchain Parties have expended tremendous time and effort in short order to address every alleged discovery deficiency.

## CONCLUSION

We have great respect for Your Honor's judicial temperament and Orders, and we have carefully abided by Your Honor's Order to complete discovery.  *See* Exhibits A & B.  Now, Defendants come asking for dismissal, draconian (and premature) injunctive relief, and permission to add new pleadings and parties.  We respectfully urge the Court to deny Defendants' letter application, and instead Order a short mediation so that, with Your Honor's sage guidance, we may resolve all pleaded and still to be pleaded claims, counterclaims and defenses.

Respectfully submitted,

*Jacques Catafago*

Jacques Catafago


cc:      all counsel of record (via ecf filing)